SKC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Guadalupe Gonzalez, et al.,

Plaintiffs,

v.

Phillip Nelson, et al.,

Defendants.

No. CV 15-01200-PHX-PGR (MHB)

**ORDER**

Plaintiffs Guadalupe Gonzalez, Phillip Nelson, Christopher Sheridan, Brian Stallings, William Rice, and Steve Barger, who were confined in the Arizona State Prison Complex (ASPC)-Lewis in Buckeye, Arizona, brought this civil rights action through counsel pursuant to 42 U.S.C. § 1983. Pending before the Court are Defendants Fink, Grabowski, Summers, and Whiting's Motion for Summary Judgment (Doc. 46) and Defendant Cardinale's separate Motion for Summary Judgment (Doc. 49). Plaintiffs oppose both Motions. (Doc. 54, 56.)[1]

The Court will grant Defendants Fink, Grabowski, Summers, and Whiting's Motion for Summary Judgment in part and deny it in part and will grant Defendant Cardinale's Motion for Summary Judgment.

. . . .

. . . .

[1] In its discretion, the Court denies the Parties' requests for oral argument as it would not aid the decisional process. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

## I. Background

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiffs stated claims in Count Two against Defendants ASPC-Lewis employees Grabowski, Whiting,[2] Garrison, Reed, Fink, Harvey, Metcalf, Cardinale, Delgado, Roman, Perry, and Summers in Count Two and directed these Defendants to answer these claims. (Doc. 3.) The Court dismissed the remaining claims and Defendants. (*Id.*) The Court subsequently dismissed Defendants Garrison, Reed, Metcalf, Delgado, and Roman without prejudice for failure to serve pursuant to Federal Rule of Civil Procedure 4 (m). (Doc. 19.)

Plaintiffs' claims arise from a search operation that took place after a homicide occurred at ASPC-Lewis in July 2014, at which time Plaintiffs were taken outside so that prison personnel could search their housing unit. (Doc. 22 ¶¶ 21−23.) Plaintiffs allege that, as a result of being forced to sit on a hot concrete basketball court in the recreation yard during the search, they suffered severe contact burns. (*Id.* ¶¶ 37, 46−50.) They relevantly allege that Defendants Grabowski, Whiting, Fink, and Cardinale were all involved in the search, and all of them forced Plaintiffs to sit on the concrete despite knowing about the heat and the risk of injury to Plaintiffs. (*Id.* ¶¶ 54−55.) Defendant Summers also knew of the risk of injury to Plaintiffs from a previous search in March 2014, but Summers did not change the protocol for searches until after the July 2014 incident. (*Id.* ¶¶ 61−62.) Plaintiffs seek monetary damages. (*Id.* at 9.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

---

[2] Also spelled "Whitting" in Plaintiffs' pleadings.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Defendants Fink, Grabowski, Summers, and Whiting's Motion

### A. Relevant Facts

ASPC-Lewis, in Buckeye, Arizona, houses approximately 6,000 inmates, from minimum to maximum custody levels, and consists of eight housing units. (Doc. 47 (Defs.' Separate Statement of Facts) ¶ 1.) The Bachman Unit has two yards, the Red yard for minimum protective custody, and the Blue yard for maximum protective custody. (*Id.*) The Red yard contains two housing dorms, Dorms 4 and 5. (*Id.*)

The Tactical Support Unit (TSU) at ASPC-Lewis is deployed in a variety of situations, including after a homicide. (*Id.* ¶ 2.) After a homicide, the TSU conducts

searches of the housing unit for contraband and information related to the investigation or that could be used in retaliatory attacks. (*Id.*) A high level of control is needed at this time due to the potential for violence and retaliation among a large population of inmates, including unknown offenders, accomplices, and motives. (*Id.*)

On Friday, July 4, 2014, an inmate was found non-responsive in his bed in the Bachman Unit, Dorm 4. (*Id.* ¶ 3.) A preliminary investigation showed the inmate had been strangled. (*Id.*) On Monday, July 7, 2014, the TSU was deployed to search the Bachman Unit, Dorms 4 and 5. (*Id.*) The overall operation involved 24 TSU members, 6 Special Security Unit members, and 4 K-9 officers. (*Id.* ¶ 11.)

**Defendant Grabowski** was responsible for the security at ASPC-Lewis, including Arizona Department of Corrections (ADC) security and civilian staff, and he was in charge of the TSU and the overall search operation ("the Operation") conducted that day. (*Id.* ¶ 5.)

**Defendant Fink** was a Correctional Officer (CO) II and a TSU officer on the team that conducted the Operation. (*Id.* ¶ 6.) Fink was responsible for the security of the recreational field, inmates, and property, and he was assisting during the Operation with the movement of inmates. (*Id.*) He was responsible for the organization and control of the inmates on the recreation field during the searches of the dorms, during which time he was armed with a pepper-ball launcher. (*Id.*)

**Defendant Cardinale** was a CO II and a Squad Leader on the TSU who ran the inside search teams on July 7, 2014. (*Id.* ¶ 7.) Cardinale ensured that the teams properly carried out their searches and that the housing areas were left orderly after the searches. (*Id.*) He was also in charge of bringing some inmates back inside the dorms after the searches were completed. (*Id.*) Cardinale had no authority over where inmates were placed during the Operation. (*Id.*)

**Defendant Whiting** was the Chief of Security at the Bachman Unit, and he was generally responsible for helping to facilitate the Operation and the movement of inmates on July 7, 2014. (*Id.* ¶ 8.) Whiting oversaw searches, as needed, and he walked around

talking to the inmate population and periodically spoke to ADC personnel on the blacktop surrounding the recreation field concerning the progress of the Operation. (*Id.*)

**Defendant Summers** was the Associate Deputy Warden of the Bachman Unit, and he was responsible for coordinating with and assisting the TSU and other authorities, such as K-9 and criminal investigations units, involved in the Operation. (*Id.* ¶ 9.) During the Operation, Summers was between buildings, outside, in the administration building, or in the visitation area assessing the gear of the TSU staff. (*Id.*) He also conducted "post checks." (*Id.*)

According to Grabowski's declaration testimony, the decision "was made" to put the inmates outdoors during the Operation because no safe indoor facilities were available, and placing the inmates on the recreation field allowed a limited number of TSU officers to control the inmates safely during searches of the dorms. (Doc. 47-1, Ex. 1 (Grabowski Decl.) ¶ 9 (Doc. 47-1 at 5).)[3] The factors considered were "the type of search being conducted, the time of day, the start time and anticipated duration of the searches, the temperature and weather conditions, the custody level of the yard, the compliant and cooperative nature of the inmates, the potential for violence, and the need to timely complete the operation in order to mitigate potential volatility." (*Id.*)

**1. The Search Operation**

Shortly after 6:00 a.m., search personnel were briefed on the expected temperature that day, the anticipated duration of the searches of Dorms 4 and 5, and the importance of hydration for staff and inmates. (*Id.*) Defendant Grabowski made clear that inmates would be removed from the dorms and be provided water and bathroom breaks while outside, and if the temperature reached 100 degrees,[4] the searches would continue, but the officers should consider moving any inmates still outside to an indoor location while the searches were completed. (*Id.*, Grabowski Decl. ¶ 16 (Doc. 47-1 at 7).)

---

[3] The cited evidence does not say who made this decision.

[4] All temperatures provided in this Order are stated in degrees Fahrenheit.

Defendant Grabowski monitored the temperature that day, and, at 11:50 a.m., it was 100 degrees. (Doc. 58-3, Ex. I (Grabowski Dep. 26:19–20, Oct. 18, 2016 (Doc. 58-3 at 8).)[5] At approximately 12:20 p.m., Defendant Grabowski advised Defendant Whiting and Sgt. Nunez that the temperature was climbing and, when it got to 100 degrees, to take steps to move the inmates still on the field into the chow hall. (Grabowski Decl. ¶ 43 (Doc. 47-1 11); Grabowski Dep. 24:9−22, 26:8−28:3 (Doc. 58-3 at 7, 8).) Defendant Whiting and Sgt. Nunez were also monitoring the outside temperature using their phones. (Grabowski Dep. 30:11−14 (Doc. 58-3 at 9).)

Plaintiffs were all housed in Dorm 5 when TSU officers entered and strip-searched the inmates. (Doc. 47 ¶¶ 12−13.) After this, each inmate dressed in boxer underwear, shorts or pants, a shirt, and tennis or shower shoes; some inmates also wore socks or hats. (*Id.*) Plaintiffs Barger, Gonzalez, Nelson, and Sheridan dressed in boxer underwear, shorts, shirts, and shower shoes; Plaintiffs Rice and Stallings additionally wore socks. (Doc. 47-1, Ex. 3 (Cardinale Decl.) ¶ 4 (Doc 47-1 at 33).) At approximately 11:13 a.m., the searches of Dorm 5 began, and the Dorm 5 inmates began going outside onto the recreation field. (Doc. 47 ¶ 20.)

Based on the photograph and DVD evidence Defendants provide, the recreation field is a large fenced-in, mostly dirt and/or gravel area that contains two concrete basketball courts and at least four awning-covered picnic tables, but no trees or vegetation. (Doc. 47, Exs. 1A−1E (Doc. 47-1 at 22-25).) The fenced-in area is surrounded by a narrow asphalt or blacktop roadway, which, in turn, is surrounded by another section of dirt/gravel that runs between the asphalt roadway and the housing units. (*Id.*) A concrete walkway leads from Dorm 5 to the edge of the blacktop, then picks up on the other side of the blacktop and leads partway into the fenced-in part of the

---

[5] Grabowski's testimony that it was 100 degrees at 11:50 a.m. conflicts with other testimony that he told Defendant Whiting and Sgt. Nunez at 12:20 p.m. to begin moving the inmates inside when the temperature got to be 100 degrees. (*See* Grabowski Decl. ¶ 43 (Doc. 47-1 11); Grabowski Dep. 24:9–22, 26:8–28:3 (Doc. 58-3 at 7, 8).) Additional facts, based on whether reports for Buckeye, Arizona that day, show that the outside temperature at 11:15 a.m. was 95 degrees; from 12:07 to 12:26 p.m., it was 98.6 degrees; and, at 12:35 p.m., it was 100.4 degrees. (*See* Doc. 47 ¶¶ 20, 34, 35.)

yard. (*See* Doc. 47-1 at 25.) The reported temperature in Buckeye at the time Plaintiff's walked out onto the recreation field was 95 degrees and the heat index was 94.4 degrees. (Doc. 47 ¶ 20.)[6]

The inmates entered the recreation field in order of the six runs in Dorm 5 (from A-run through F-run). (Doc. 47 ¶ 21.) For safety and security purposes, once the inmates from each run arrived inside the recreation field, they were instructed to form a line on the basketball court and sit down Indian style with no talking. (*Id.* ¶ 22.) TSU officers, including Defendant Fink, told the inmates they were not to talk or look at anyone or they would be placed in the "pumpkin patch," meaning face-down in the dirt, handcuffed. (Doc. 63 ¶ 22.) When this is done, the inmate is placed out in front of everyone. (*Id.*; Doc. 58-3, Ex. H (Fink Dep. 32:6–9, Oct. 17, 2016) (Doc. 58-3 at 4).)

Plaintiffs Sheridan, Rice, Nelson, Stallings, and Gonzales were housed in A-Run, which was the first run to be placed on the recreation field. (Doc. 47 ¶ 23.) Plaintiff Sheridan was the third inmate to go outside from A-Run; Plaintiff Rice was the thirteenth; Plaintiff Nelson was the eighteenth; Plaintiff Stallings was the twenty-first; and Plaintiff Gonzalez was the twenty-third. (*Id.* ¶¶ 24−26.) Plaintiff Barger was housed in C-Run, and he was the eleventh inmate to go outside from C-Run, which was the third run to enter the recreation field. (*Id.* ¶¶ 30−31.) When Plaintiff Barger entered the recreation field and sat down on the basketball court, the reported temperature for Buckeye was 98.6 degrees and the heat index was 97.6 degrees. (*Id.* ¶ 31.)

---

[6] The temperature readings throughout Defendants' Statement of Facts are taken from the Weather Underground website, https://www.wunderground.com/q/zmw:85326.1.99999, of which Defendants request the Court take judicial notice pursuant to Federal Rule of Evidence 201. (*See* Doc. 47 at 6 n.1.) Plaintiffs do not dispute that Defendants provide the correct temperature readings for Buckeye, Arizona that day or that Defendant Grabowski was also monitoring the temperature in the area at the time, but they note that Defendants did not check the actual temperature of the recreation field where the inmates were located using the thermometer on the yard, and no Defendant used an infrared thermometer to check the temperature of the concrete while the inmates were sitting on it, even though they had the resources to do so. (Doc. 63 ¶ 20.) The Court has relied on Defendants' cited facts regarding the temperatures on July 7, 2014 only to show the reported temperatures for Buckeye, Arizona generally.

According to Plaintiff Rice, "someone [on the TSU] told one of the TSU officers that is was too hot to sit on the basketball court" when the inmates were first going out of the building and preparing to enter the recreation field. (Doc. 63 ¶ 10, Doc. 58-1, Ex. C (Rice Dep. 22:14–23:11, July 22, 2016 (Doc. 58-1 at 6).) Additionally, when Plaintiff Sheridan later complained about burn injuries and treatment by staff to Defendant Whiting after the Operation, Whiting told him, "'I'm sorry this happened to you guys. I told them that it was not a good idea to put you outside" due to the extreme heat. (Doc. 63 ¶ 10, Doc. 58-1, Ex. D (Sheridan Dep. 38:16–39:3, July 22, 2016 (Doc. 58-1 at 13).) Plaintiff Stallings also heard Defendant Whiting tell the inmates during a meeting after the incident that he had advised TSU and his subordinates that placing the inmates outside during an excessive heat warning was not a good idea. (Doc. 63 ¶ 10; Doc. 58-1, Ex. E (Stallings Dep. 39:21–40:19, July 22, 2016 (Doc. 58-1 at 7).)

According to Defendants' facts, Plaintiff Nelson was outside for approximately 2 minutes and had been seated on the basketball court for approximately 1 minute, 39 seconds, when he was permitted to get up from where he was seated and sit in the shade. (*Id.* ¶ 26.) Approximately 25 minutes later, he was returned to Dorm 5, and he did not return to the recreation field. (*Id.*) According to Plaintiff's facts, Plaintiff Nelson was seated on the concrete for 15−20 minutes, and he noticed his leg was immediately hot, "[n]ot as intense, but as if it was touching a stove." (Doc. 63 ¶ 26; Doc. 58, Ex. B (Nelson Dep. 59:2–5, 21–25, Nov. 4, 2016 (Doc. 58 at 15).) Plaintiff Stallings heard Plaintiff Nelson talking to Defendant Fink and heard someone exclaim "that don't look good," or something to that effect, prior to Plaintiff Nelson being permitted to move to the shade. (Doc. 63 ¶ 26, Stallings Dep. 49:9−14, 51:18−52:1 (Doc. 58-2 at 9).) Plaintiff Nelson was outside for a total of approximately 28 minutes. (Doc. 47 ¶ 27.)

Plaintiffs Sheridan, Rice, Nelson, Stallings, and Gonzalez (from A-Run) were given a standing/walking water break from approximately 11:58 a.m. to 12:02 p.m. (Doc. 47 ¶ 32.) Plaintiff Stallings chose not to drink water during this break. (*Id.*)

The inmates from C-Run were given a standing/walking water break from approximately 12:05 p.m. to 12:09 p.m. (*Id.* ¶ 33.) Plaintiff Barger walked with his shoes on during the entire break. (*Id.*)

From approximately 12:07 p.m. to 12:26 p.m., seventeen inmates from A-Run, including Plaintiffs Sheridan, Rice, and Stallings, were given indoor bathroom breaks inside Dorm 5. (*Id.* ¶ 34.) Plaintiff Gonzalez was not among those who took a bathroom break. (*Id.*) The outside temperature for Buckeye at that time was 98.6 degrees, and the heat index was 97.6 degrees. (*Id.*) At 12:35 p.m., the outside temperature was 100.4 degrees, and the heat index was 98.8 degrees. (*Id.* ¶ 35.)

From approximately 12:38 p.m. to 12:41 p.m., the inmates from A-Run were given a second standing/walking water break. (*Id.* ¶ 36.) Plaintiffs Sheridan, Rice, and Gonzalez stood up and got water, and Plaintiff Stallings chose to remain seated and not get water. (*Id.*)

At approximately 12:45 p.m., the inmates from C-Run stood up and went back inside Dorm 5. (*Id.* ¶ 37.) According to Defendants' facts, Defendant Cardinale then saw Plaintiff Barger approaching the perimeter of the recreation field and noticed he was walking without his shoes. (*Id.* ¶ 38; Grabowski Decl. ¶ 50 (Doc. 47-1 at 12); Cardinale Decl. ¶ 10 (Doc 47-1 at 34).) Cardinale asked Barger why he was walking barefoot, and Barger said his shower shoe was broken. (Cardinale Decl. ¶ 10.) Cardinale immediately advised Barger to run to avoid burning his feet, and Barger ran past one or two other inmates across the remaining 20 yards of concrete walkway and asphalt into Dorm 5. (*Id.*) Defendants point to the security camera footage of this incident, which shows one of the officers walking alongside the inmates as they are crossing the gravel, then walk ahead, approach an inmate as he is nearing the concrete walkway that leads through the open gate at the perimeter of the yard, and motion toward the gate, after which the inmate begins to hop or jog quickly and passes other inmates as they walk out onto the asphalt toward Dorm 5. (*See* Doc. 48, DVD 2 of 4 at elapsed time 2:45:50−2:45:57.)

According to Plaintiffs' facts, as soon as the inmates stood up, Plaintiff Barger asked Defendant Cardinale for new shoes because his shower shoes were broken and it was too hot to run barefoot, and Cardinale told him he could get new shoes when he got inside. (Doc. 63 ¶ 38; Doc. 58, Ex. A (Barger Dep. 19:15–20:7, July 22, 2016 (Doc. 58 at 2).) The DVD evidence has no sound and is filmed from too far away from the basketball court to confirm whether any of the inmates spoke to any of the officers when they first stood up and prepared to walk across the yard. (DVD 2 at 2:44:49−2:45:27.)

When Defendant Cardinale returned to Dorm 5, he advised his Commander that Plaintiff Barger had been walking barefoot while the inmates in C-Run were returning from the recreation field. (Doc. 47 ¶ 39.) Shortly afterwards, medical was called to evaluate Barger's feet. (*Id.*)

At approximately 1:01 p.m., the inmates from A-Run stood up to go back to Dorm 5. (*Id.* ¶ 40.) These inmates were all back inside at approximately 1:02 p.m. (*Id.*) At 1:15 p.m., the outside temperature in Buckeye was 102.2 degrees, and the heat index was 100.9 degrees. (*Id.*) At approximately 1:35 p.m., all the remaining Dorm 5 inmates who were still on the recreation field were brought into the chow hall. (*Id.* ¶ 44.) About 5 minutes later, the outside temperature in Buckeye was 102.2 degrees, and the heat index was 100.9. (*Id.*)

In sum, Plaintiff Nelson was outside on the recreation field for approximately 28 minutes; Plaintiffs Rice, Sheridan, and Stallings were outside on the recreation field for approximately 1 hour and 35 minutes; Plaintiff Barger was outside on the recreation field for approximately 1 hour and 15 minutes; and Plaintiff Gonzalez was outside on the recreation field for approximately 1 hour and 45 minutes. (*Id.* ¶¶ 27, 41−43.)

The inmates were generally calm and cooperative during the search of Dorm 5, and there were no major disturbances by any inmates. (*Id.* ¶ 45.) There were only two instances in which inmates had to be separated from the group and placed in a prone position a safe distance away until staff concluded it was safe to return them to the group. (*Id.* ¶ 47.) During the time the Dorm 5 inmates were on the recreation field, at least 12 of

them were permitted to go to the shade after advising staff they needed to do so, and none of the inmates hesitated to sit down on the basketball court. (*Id.* ¶¶ 50–51.)

The parties dispute whether Plaintiffs showed any signs of distress and/or advised staff of any issues they were having with the heat or of any injuries or burns. According to Defendants' facts, Plaintiffs Gonzalez, Rice, Sheridan, and Stallings did not show any indications of unusual pain or discomfort, and they did not complain to staff about the heat or any injuries while on the recreation field or during the water and bathroom breaks. (Doc. 47 ¶ 52.)[7] According to Plaintiffs' facts, Plaintiff Sheridan noticed his buttocks were burning about five to ten minutes after sitting down but did not say anything for fear of being placed in the pumpkin patch (Doc. 63 ¶ 51 (Doc. 58-1, Ex. 2 (Sheridan Dep. 13:5–19, July 22, 2016 (Doc. 58-2 at 9)); Plaintiff Stallings noticed his buttocks were burning within two to three minutes of sitting down (Stallings Dep. 20:21–21:2 (Doc. 58-2 at 3)); Plaintiff Rice complained aloud that the basketball court was hot and the inmates were burning but was told to shut up (Rice Dep. 9:6–23 (Doc. 58-1 at 2)); and other inmates complained to Defendant Fink about these issues but were ignored (Barger Dep. 25:16–26:8 (Doc. 58 at 5–6)). Plaintiff Barger also complained to a TSU officer sometime between the first water break and when the inmates returned inside that he needed a new pair of shoes, and he was told he could get a new pair when he returned to the dorm. (Doc. 63 ¶ 53; Barger Dep.16:6–18:12 (Doc. 58 at 2; Doc. 59 at 3).) According to Barger, his shoes came apart because the adhesive attaching the strap to the shoe melted, causing the strap to detach from the shoe. (Barger Dep. 17:1–8 (Doc. 59 at 3).)

---

[7] Defendants also state in their Statement of Facts that Plaintiff Barger did not show any indications that he was in any unusual pain or distress while he was on the recreation field or when he was given a water break, and he only complained during the approximately 35 seconds that he walked barefoot across the recreation field, concrete walkway, and blacktop. (Doc. 47 ¶ 53.) In support, Defendants rely on the declaration testimony of Defendant Grabowski based on Grabowski's review of the DVD evidence, but Grabowski does not claim to base these assertions on his own observation; nor does he cite to the portion of the DVD evidence that supports his testimony. (*See* Grabowski Decl. ¶ 68 (Doc. 47-1 at 15).) Accordingly, the Court has not considered this evidence.

**2. Plaintiff's Additional Facts**

On the date of the Operation, Plaintiff Barger saw CO II Lee take the temperature of the basketball court. (Doc. 63 ¶ 57; Barger Dep. 11:10−12:1 (Doc. 59 at 2).) This did not happen while Barger was seated on the basketball court but took place sometime after the Operation was complete. (Barger Dep. 11:14−18, 12:21−13:2 (Doc. 59 at 2).)[8] At some point, Plaintiff Stallings and some other inmates went back outside to show an officer their burns, and they spoke to CO II Lee, who had a thermometer gun in his hand that he used to read the temperature of the basketball court. (Stallings Dep. at 24:2−10 (Doc. 58-2 at 4).) Lee showed the inmates the reading, and Stallings saw that it was 143 degrees. (*Id.* at 24:11−15.)

As a result of these events, Plaintiff Barger was burned on his left foot and had surface burns on his buttocks and the tops of both feet. (Barger Dep. at 26:15−17 (Doc. 58 at 6).) His left foot formed blisters immediately after he returned inside, and he was sent to the day room where photographs were taken. (*Id.* at 27:6−25.) The blisters formed on the ball of the foot and were painful to walk on for over a month before they healed. (*Id.* at 34:1−35:1.)[9]

---

[8] Plaintiffs cite to Barger's deposition testimony in which Barger states that he subsequently spoke to CO II Lee, who told him he took the temperature of the asphalt (not the basketball court) and "said it was 160 something at that time;" they also cite to Plaintiff Rice's deposition testimony in which Rice states that the officers "told us they [took the temperature of the basketball court]." (*See* Doc. 63 ¶ 59; Barger Dep. 12:7−20 (Doc. 59 at 2); Rice Dep. 18:19−25 (Doc. 58-1 at 5).) These second-hand statements about what non-party officers purportedly said is hearsay, and there is insufficient evidence to show these officers were acting as agents or employees of any Defendant to meet the hearsay exclusion in Federal Rule of Evidence 801(d)(2)(D).

[9] Defendants object to this and other testimony from Plaintiffs regarding the severity of their burns on the ground that the second-hand medical opinions they refer to are hearsay and Plaintiffs do not point to any admissible portions of the record to support their assertions. (Doc. 67 at 5-6.) To the extent that Plaintiffs testify about what medical providers said to them about their burns, the objection is sustained on hearsay grounds, and the Court will not rely on this evidence. To the extent that Plaintiffs testify about their symptoms from their own knowledge and experience, however, the objection is overruled. *See* Fed. R. Civ. P. 56(c)(4); *S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass' n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (declarant has personal knowledge of her own symptoms); *see also Thomas v. Garcia*, 1:08-cv-00689-JLT (PC), 2013 WL 3773861, at *11 (E.D. Cal. July 17, 2013) (a party may testify as to what he felt when injured, how the injury affects him now and impacts his life, and any other information within his own personal knowledge based upon his own perceptions). _

Plaintiff Nelson complained of a burn to his leg after returning inside and was later seen for "burns and blister on his legs." (Nelson Dep. 25:5, 29:20–25 (Doc. 58 at 12, 13).) By the next evening, when he went to get a bandage changed, he had a large blister a couple of inches in diameter. (*Id.* 61:10–17.)

Plaintiff Rice had a burn on his left butt cheek that caused him pain when he sat down for a few weeks to a month until it healed. (Rice Dep. 10:21–11:15, 17:22–18:11 (Doc. 58-1 at 2–3, 5).)

Plaintiff Sheridan had burns on his left and right buttocks that Sgt. Schwartz photographed the night of the incident. (Doc. 58, Ex. D (Sheridan Dep 19:20–24, 20:23–23, July 22, 2016 (Doc. 58-1 at 10).) The burns developed blisters in the night that popped the next day and took one to two weeks to heal. (*Id.* 33:8–22.) Nurse Crotty looked at Sheridan's burn injuries on July 20, 2014, and she gave him gauze, ointment, and Band-Aids. (*Id.* 39:11–40:3.)[10]

Plaintiff Stallings suffered a contact burn on his right calf that was three to four inches, round, and that "blistered up." (Stallings Dep. 13:2–13 (Doc. 58-2 at 2).) The blister was "sticking up off [his] leg two inches in height, and the whole circumference." (*Id.* 31:11–13.) Stallings also had burns on both his left and right buttocks that formed quarter-sized to half dollar-sized blisters that broke the night of the incident. (*Id.* 32:11–24.) He talked to Nurse Crotty about his burns. (*Id.* 58:3–10.)[11]

**3. Other Search Operations**

Non-TSU searches of the prison housing units take place on a quarterly basis. (Nelson Dep. 63:16-20 (Doc. 58 at 16).) During these searches, the inmates are also removed from the building, but the TSU-search on July 7, 2014 differed in mood from these quarterly searches. (*Id.* 64:20–23.) According to Plaintiff Nelson, "During a

---

[10] As noted, to the extent Sheridan testifies about what Nurse Crotty said to him about the severity of his burns, the Court omits that testimony on the ground that it is inadmissible hearsay and Plaintiffs do not point to any medical records to support these assertions. (*See* Doc. 67 at 5-6.)

[11] Plaintiffs also claim that Plaintiff Gonzalez suffered burns to his buttocks, but the evidence they cite to (Exhibit F) is not in their attached exhibits. (*See* Doc.63 ¶ 63.)

quarterly search they come in, they say, hey A-Run, go outside, have a seat on the basketball court. This time it was – with the TSU search its guns and pushing and shoving and get your asses out there." (*Id.* 65:3−7.) During the TSU search, the officers directing the inmates were also less tolerant of talking than officers generally are during a quarterly search. (*Id.* 65:17−66:7.)

Prior to the July 7, 2014 search, TSU conducted a similar search following an inmate murder in March 2014. (Doc. 65 ¶ 10.) During the March 2014 search, TSU removed inmates from one of the pods between 5:00 and 6:00 a.m. (*Id.*, Rice Dep. 27:4−17 (Doc. 58-1 at 14).) The inmates were kept on the basketball court for a "couple [of] hours" and Plaintiff Rice suffered "light sunburns." (*Id.* at 28:8−19.) The TSU officers followed the same procedures in March as they did in July, but it was not as hot in March as it was in July. (*Id.* at 29:8−22; Sheridan Dep. 41:4−7 (Doc. 58-1 at 13).)

**B. Discussion**

The Eighth Amendment protects prisoners from punishment that is cruel and unusual. *See* U.S. Const., amend. VIII; *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).[12] To prevail on an Eighth Amendment conditions-of-confinement claim, Plaintiffs must meet a two-part test. "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Id.* at 835. In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the

---

[12] The parties do not dispute that Plaintiffs are convicted prisoners; thus, the Eighth Amendment rather than the Fourteenth Amendment applies to their claims. *See Bell v. Wolfish*, 441 U.S. 520, 579 (1979).

inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added).

**1. Objective Prong**

The initial question for this analysis is whether the conditions Plaintiffs were exposed to during the July 7, 2014 Operation objectively constituted a sufficiently serious deprivation, such that Plaintiffs were deprived of the minimal civilized measure of life's necessities. In making this determination, the Court must consider the "circumstances, nature, and duration" of Plaintiffs' exposure to the complained of conditions. *See Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005); *Keenan v. Hall*, 83 F.3d 1083, 1089, 1091 (9th Cir. 1996).

Defendants acknowledge that prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, and that exposure to extreme heat or cold for significant periods of time is sufficiently serious to satisfy the objective component of an Eighth Amendment claim. (Doc. 46 at 7.) *See Johnson*, 217 F.3d at 731 (citing cases showing that a less-than-two-hour deprivation of shelter from extreme cold, or a "lengthy and ongoing" period of exposure to more modest conditions, is sufficient to satisfy the objective basis of an Eighth Amendment violation.) Defendants argue, however, that Plaintiffs did not suffer a sufficiently serious deprivation of access to water, shelter, or sanitation because they were outside for less than two hours in temperatures that ranged from 95 to—at most—102 degrees; were dressed in shirts, boxer underwear, shorts, and shower shoes; and were given water breaks and indoor bathroom breaks. (Doc. 46 at 8−9.) Defendants cite to a number of district court cases for the proposition that temporary deprivations that do not pose a serious threat of harm to inmates are not sufficiently serious to support an Eighth Amendment claim. (*Id.* at 6−9 (citing cases).)

The cases upon which Defendants rely are inapposite, however, because none of these cases involved circumstances, as here, in which the inmates were made to sit cross-legged on a hot surface where they allegedly suffered contact burns. The circumstances

in this action are more like those in *Gordon v. Faber*, 973 F.2d 686, 687 (8th Cir. 1992), which the Ninth Circuit cited to in *Johnson v. Lewis* as being instructive of an objectively serious deprivation. 217 F.3d at 731. In *Gordon*, inmates were sent to outdoor recreation pens in sub-zero temperatures for an hour to an hour and 45 minutes during a search for a weapon thought to be in their living area. 973 F.2d at 687. Although the inmates were provided hip-length, lined denim coats, they were denied available hats or gloves, and many of them complained of frostbite upon returning indoors. *Id.* Based on these facts, the court found that the deprivation was sufficiently "extreme" to constitute the denial of the "minimal civilized measure of life's necessities." *Id.* at 688.

So too, here, Plaintiffs testify to suffering almost immediate pain from being made to sit on the hot concrete, resulting in actual burns and blisters. (Doc. 63 ¶¶ 26, 52, 58−62.) Although Defendants dispute that any of the Plaintiffs were significantly harmed (Doc. 67 at 5-6.), Plaintiffs' sworn testimony is sufficient at the summary judgment stage to create a genuine issue of material fact that they suffered a sufficiently serious deprivation to satisfy the objective element of their claims.[13]

The Court therefore turns to the subjective prong of the analysis: whether Defendants acted with deliberate indifference towards a substantial risk of serious harm.

. . . .

---

[13] Defendants cite for the first time in their Reply to the expert opinion testimony of non-treating physician Dr. Kevin Foster to show that Plaintiffs' burns were not severe. (Doc. 67 at 6.) Defendants provide no reason why they could not have submitted this evidence with their Motion, and the Court declines to consider evidence improperly submitted for the first time in a reply. *See Wallace v. Countrywide Home Loans, Inc.*, SACV 08-1463 AG, 2009 WL 4349534, at *7 (C.D. Cal. 2009) (district court need not consider evidence submitted for the first time in a reply if it should have been presented with the opening brief). But even if the Court were to consider this evidence, Dr. Foster's opinion, at most, raises questions of fact about whether the burns Plaintiffs suffered were as severe as they alleged; not whether Plaintiffs were actually burned. (*See* Doc. 67-1, Ex. 1 (Foster Decl.) ¶¶ 14−22 (Doc. 67-1 at 4−5) (acknowledging Plaintiffs had first to second degree burns).) Moreover, the Court must resolve all genuine issues of material fact in Plaintiffs' favor at the summary judgment stage, *Anderson*, 477 U.S. at 255, and Plaintiffs' sworn testimony about their experiences and symptoms raises genuine issues of material fact that they suffered sufficiently serious deprivations from being made to sit on the hot concrete to support an Eighth Amendment claim.

**2. Subjective Prong**

As stated, to show deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Farmer*, 511 U.S. at 837 (emphasis added). Where, as here, prisoners seek to hold a number of prison officials personally liable for damages, the Court must take an individualized approach that accounts for the duties, discretion, and means of each defendant. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Thus, the Court must look at "whether [each] individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference." *Id.*

Defendants argue that Defendants Fink, Grabowski, Summers, and Whiting were not deliberately indifferent because there is no evidence they were aware of facts from which they could draw the inference that Plaintiffs faced a substantial threat of serious harm, and they nonetheless acted reasonably in response to any risks posed to Plaintiffs that day. (Doc. 46 at 9.) They further argue that even if Defendants could be found to have violated Plaintiffs' constitutional rights, they are entitled to qualified immunity on these claims. (*Id.* at 11−13.)

In support of their deliberate indifference argument, Defendants primarily refer to the overall precautions taken during the Operation to prevent harm to Plaintiffs, without reference to the actions of specific Defendants. They argue, for example, that "plans were made" to provide Plaintiffs with water and indoor bathroom breaks while they were being detained on the recreation field; the inmates were adequately clothed; when the outside temperature reached 100 degrees, "steps were taken" to begin moving the inmates indoors, with all of the inmates making it inside by the time the outdoor temperature reached 101-102 degrees; and any inmates who advised staff they needed to be moved out of the heat "were allowed" to sit in the shade or brought indoors. (Doc. 46 at 9−10.) Defendants also argue that the inmates on the recreation field that day—including Plaintiffs—gave no indications of distress from which any Defendants could have

inferred that they were experiencing unusual pain or discomfort, and Defendants only discovered after the fact that Plaintiffs had been burned. (*Id.* at 10; Doc. 47 ¶¶ 52, 54.)

Defendants minimally refer to a number of paragraphs in their Statement of Facts in support, but they fail to delineate or discuss the underlying declaration and deposition testimony that pertains to their arguments. The Court has nonetheless looked to this testimony and finds it supports Defendants' claims that none of them was aware of facts from which they both could have and did infer a substantial risk of serious harm to Plaintiffs. Defendant Fink testifies that, as a work-crew boss, he has worked with inmate work crews year-round in Arizona and is able to detect when an inmate is starting to become affected by the summer heat. (Doc. 47-1, Ex. 2 (Fink Decl.) ¶ 8 (Doc. 47-1 at 29).) According to Fink, the heat did not feel so excessive the day of the Operation as to give him concern about the inmates' health and safety, particularly since the inmates were adequately clothed and were given water and bathroom breaks and movement. (*Id.*) Fink also did not observe any signs of distress or unusual discomfort among the inmates, he did not receive any complaints from any inmates about injuries or burns, and the inmates who voiced medical issues or other legitimate reasons to move were immediately permitted to move to the shade. (*Id.* ¶¶ 8–9.) Defendant Whiting also testifies that, while he was on the recreation field, he was not advised by any staff or inmates of any injuries or distress that needed to be addressed, and there was no indication to him during the time the inmates were outside that they were being injured or burned. (Doc. 47-1, Ex. 4 (Whiting Decl.) ¶¶ 6-7 (Doc. 47-1 at 42–43).) Defendant Summers testifies in kind and adds that "the thought never crossed my mind that the basketball court on which TSU had the inmates sit during the searches of Dorms 4 and 5 was so hot or was likely to become so hot as to create a serious risk of harm to the inmates." (Doc. 47-1, Ex. 5 (Summers Decl.) ¶ 6 (Doc. 47-1 at 47–48).) Defendants Whiting and Grabowski were also not made aware until after all the searches were complete and all the inmates had been returned inside that any inmates had suffered burns. (Doc. 47 ¶ 54.) This evidence is sufficiently specific about what these officers observed during the Operation to satisfy

Defendants' initial burden of showing that no Defendant actually knew of and deliberately disregard a substantial risk of serious harm to Plaintiffs.

In their Response, Plaintiffs likewise tend to rely mostly on blanket statements regarding all Defendants rather than to delineate specific actions to show or create a genuine issue of material fact that each, individual Defendant was deliberately indifferent to a substantial risk of serious harm to Plaintiffs. To the extent possible, the Court has tried to discern the intended bases of Plaintiffs' claims as to each Defendant to determine whether Plaintiffs have set forth any genuine issues of material fact that preclude summary judgment as to these Defendants.

a. **Grabowski and Whiting**

Plaintiffs first argue that, at 12:20 p.m. the day of the Operation, Defendants Grabowski and Whiting discussed moving the inmates indoors if the temperature reached 100 degrees, but the temperature had already reached 100 degrees 30 minutes earlier when the inmates were on the recreation field, and the inmates did not begin "to be moved" until approximately 50 minutes later. (*Id.*) From this, Plaintiffs appear to argue that at least Grabowski and Whiting knew of and disregarded a substantial risk of serious harm to Plaintiffs from allowing them to remain outdoors after the temperature reached 100 degrees.

As an initial matter, the record contains no evidence that Plaintiffs were seriously harmed simply from being outside for up to 1 hour and 45 minutes in temperatures that progressively rose from 95 to 102 degrees, during which time it is undisputed they were provided water and bathroom breaks. Instead, Plaintiffs' assertions of serious pain and/or injuries all relate to their contact with the hot surface of the basketball court, and there is no evidence that Defendants Grabowski and Whiting observed the inmates on the basketball court or were otherwise made aware of facts from which they inferred that Plaintiffs were being burned. The evidence Plaintiffs refer to above shows, at most, that Grabowski and Whiting subjectively concluded that leaving Plaintiffs outside after the temperature reached 100 degrees would create an unacceptable level of discomfort or

harm to the inmates. Their actions at that juncture, however, do not show or create a genuine issue of material fact that these Defendants believed Plaintiffs were at risk of serious injury, or, even if they did, that they acted with deliberate indifference to that risk.

As to Defendant Grabowski, Plaintiffs appear to argue, based on Grabowski's self-contradicted deposition testimony (that the outside temperature first reached 100 degrees at 11:50 a.m.) that Grabowski should have directed TSU officers to move the inmates inside 30 minutes earlier than he did. (Doc. 54 at 5.) But Grabowski also testifies that he advised Defendant Whiting and Sgt. Nunez shortly after 12:00 p.m. "that the temperature was climbing, and *when it gets to 100º F*, to start taking steps" to move the inmates inside. (Grabowski Decl. ¶ 43 (Doc. 47-1 11) (emphasis added).) This shows that, at the time Grabowski spoke to Whiting and Nunez, he believed the outside temperature had not yet reached 100 degrees, and he did not consider the risk to Plaintiffs from the heat substantial enough at that point to call for immediate action.[14] Instead, he directed Whiting and Nunez to start taking steps to move the inmates *after* the temperature (which he noted was climbing) actually reached 100 degrees, which is what the evidence shows took place. But even if, as Plaintiffs appear to argue, Grabowski subjectively believed the temperature had already reached 100 degrees at 11:50 a.m. and he failed to direct anyone to move the inmates at that time, this, also, is insufficient to show he acted with deliberate indifference to a substantial threat of serious harm. As noted, the undisputed objective evidence does not support that the temperature had actually reached 100 degrees at that time; nor is there any evidence to support that remaining in 100 degree heat for an extra 30 minutes of a less than two-hour period, in itself, posed a substantial risk of serious harm to Plaintiffs.

. . . .

[14] The undisputed evidence that Defendants rely on to document the reported temperature in Buckeye, Arizona that day shows that at 11:35 a.m., 11:55 a.m., and 12:15 p.m. the temperature was 98.6 degrees, and, at 12:35 p.m., it was 100.4 degrees. *See* https://infoseek.wunderground.com/history/airport/KBXK/2014/7/7/DailyHistory.html?req_city=Buckeye&req_state=AZ&req_statename=&reqdb.zip=85326&reqdb.magic=1&reqdb.wmo=99999 (last visited August 2, 2017.)

As to Defendant Whiting, there is no evidence that Whiting failed to direct the officers overseeing the inmates on the recreation field to take steps to bring the inmates back inside when the temperature actually reached 100 degrees, as Defendant Grabowski had directed. The undisputed evidence shows that, subsequent to this conversation, the outside temperature reached 100.4 degrees at 12:35 p.m.; the inmates from A-Run were then given a standing/walking water break from 12:38 p.m. to 12:41 p.m.; the inmates from C-Run were moved back inside at 12:45 p.m., and the inmates from A-Run were moved back inside at 1:01 p.m. (Doc. 47 ¶¶ 35, 36, 37, 40.) At most, the inmates from A-Run were outside for 26 minutes after the temperature reached 100 degrees, part of which time they were receiving a standing/walking water break, and part of which time other inmates were already being moved inside. Inferring from Whiting's position as the Security Chief that Whiting was responsible to direct and/or oversee the movement of the inmates during this time, these facts do not support that he acted with deliberate indifference to a known risk of serious harm to Plaintiffs.

Plaintiffs also argue, again without reference to any particular Defendant, that the temperatures that day "were not being monitored" on site, even though Defendant Whiting had suggested to Defendant Grabowski at one point that this should be done. (Doc. 54 at 5; Whiting Dep. at 47:4-10 (Doc. 58-3 at 15).) To the extent Plaintiffs suggest that Grabowski is the one who had the authority and responsibility to order temperature checks, and he failed to ensure that the officers monitored the actual outside temperature on the recreation field instead of relying on weather reports from their cell phones, this does not show deliberate indifference. Absent additional facts that there was a large discrepancy between the temperatures the thermometer showed on the recreation field and the temperature readings the officers saw on their phones, and that Grabowski had reason to know of but disregarded this discrepancy, the mere fact that Whiting at some point recommended a more precise way of tracking the actual temperature that Grabowski failed to implement does not show that Grabowski had a "sufficiently

culpable state of mind" to support an Eighth Amendment claim. *Farmer*, 511 U.S. at 837.

Plaintiffs similarly argue that the temperature of the concrete "was not taken" with an infrared thermometer gun until some unknown time after the inmates had gone inside, at which point the gun showed the surface temperature was 143 degrees. (Doc. 54 at 5−6.) Again, it is unclear who Plaintiffs seek to hold liable for the failure to use an infrared device to register surface temperature at the time Plaintiffs were made to sit on the basketball court. Moreover, absent additional facts showing that any individual Defendant knew that the surface temperature of the concrete posed a substantial risk of serious harm to Plaintiffs and deliberately disregarded this risk at the time, the fact that the temperature of the concrete "was not taken" until after the fact may suggest negligence or gross negligence but is not sufficient to find that a particular Defendant or Defendants intentionally violated Plaintiffs' constitutional rights. *See Farmer*, 511 U.S. at 837 ("Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety) (internal citation omitted).

Plaintiffs also argue that when TSU conducted a similar search in March the same year, when the temperatures were significantly lower than in July, inmates complained of suffering sunburns and other minor health problems from being made to sit on the basketball court, and they filed grievances about these issues following the incident. (Doc. 54 at 6−7.) To the extent Plaintiffs appear to claim this put Defendants on notice that placing inmates in the same conditions in July would subject them to serious harm, Plaintiffs do not cite properly to their Statement of Facts and, nonetheless, provide only hearsay testimony to show that anyone sustained injuries or made complaints about this incident. (*See* Doc. 63 ¶ 65.)[15] Moreover, Plaintiffs produce no evidence to show that

---

[15] Plaintiffs cite to paragraph 62 of their Statement of Facts, which does not point to any evidence about the March 2014 search. The Court assumes this was in error, and that Plaintiffs meant to cite to paragraph 65, which does pertain to that search. The Court has therefore looked to the underlying evidence in support of paragraph 65. Plaintiffs should be aware, however, that the Court is "not required to comb the record" to find supporting evidence. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("[j]udges

any Defendants were involved in the prior search operation or were otherwise made aware of the alleged injuries and complaints.

**b. Fink and Summers**

Plaintiffs argue more specifically that Defendant Fink was made aware of and deliberately disregarded the risk of serious harm to Plaintiffs from the hot condition of the basketball court. (Doc. 54 at 6.)

Once again, the citations Plaintiffs point to in their Statement of Facts do not support this claim. (*See id.*) Nonetheless, as the Court already partially summarized in the fact section above, the record contains sufficient deposition testimony from Plaintiffs Rice, Barger, and Stallings upon which a reasonable jury could find that Defendant Fink both could have and did infer that Plaintiffs were being burned and Fink deliberately disregarded their complaints. For example, Plaintiff Rice testified that, shortly after being placed on the basketball court, he and other inmates "realized it was hot" and complained to the officers "that it's hot, that we're burning," but they were told to shut up. (Rice Dep. 9:2-19 (Doc. 58-1 at 2).) Although Rice does not identify Defendant Fink, in particular, Plaintiff Barger also testifies that inmates made complaints such as "[i]t's hot, my feet are burning, my butt is burning, those kinds of things" and that "Fink was definitely complained to" as he was one of the "primary officers" keeping watch over the inmates. (Barger Dep. 23:19−21, 25:16−19 (Doc. 58 at 3).) Added to this, Plaintiff Stallings testifies that, after roughly 20 to 30 minutes of being out on the recreation field, he heard Defendant Fink talking to Plaintiff Nelson and heard someone exclaim "that don't look good," or something to that effect, after which Plaintiff Nelson was permitted to move to the shade. (Stallings Dep. 49:9−14, 51:18−52:1 (Doc. 58-2 at 8−9).) Taken together, these statements show that Fink was one of the officers directly overseeing the inmates on the basketball court when they complained aloud to the officers about being burned but were ignored or told to shut up, and Fink spoke to

---

are not like pigs, hunting for truffles buried in briefs") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Plaintiff Nelson at the time Nelson had to be moved due to his injuries, at which point someone exclaimed, "that don't look good." From these facts, a reasonable jury could conclude that Fink was aware that all the inmates faced a substantial risk of serious harm from having to remain where they were, but he, at most, responded only to Plaintiff Nelson's injuries and ignored the other inmates' complaints.

Defendants present contrary evidence from Defendant Fink's deposition, in which Fink testifies that the only time any inmates spoke to him about sitting on the basketball court was when the first row of inmates sat down and asked if they could sit on their shower shoes because it was hot, and Fink told them they could. (Doc. 67 at 7; Fink Dep. 34:16–23 (Doc. 67-1 at 16).) This evidence raises credibility issues concerning Plaintiffs' above-cited testimony. But the Court is not to decide credibility issues at summary judgment. Rather, where the parties present competing versions of what happened, the Court must take the non-moving party's evidence as true. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) ("If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true"); *see also McLaughlin v. Lui*, 849 F.2d 1205, 1208 (9th Cir. 1988) (the nonmoving party's sworn statements on a central fact in dispute are direct evidence that preclude summary judgment).

Defendants also argue that the video evidence from the four DVDs provided in this action shows no instance of inmates complaining to Defendants or any other officers concerning any distress or injuries they suffered, either while they were seated on the basketball court or during any of their breaks. (Doc. 67 at 7, 8, 9.) Defendants rely on Defendant Grabowski's opinion upon watching these DVDs that they provide "no indication that inmates Sheridan, Rice, Stallings, or Gonzalez ever hesitated to sit down on the basketball court or that sitting on the basketball court was causing them any pain or discomfort." (Grabowski Decl. ¶ 67 (Doc. 47-1 at 15).)

This testimony about what the DVD evidence appears to show is unpersuasive. First, Defendant Grabowski does not explain, apart from identifying the order in which Plaintiffs went out and were seated, how he was able to identify or keep track of Plaintiffs and their various movements in these recordings. (*Id.* ¶¶ 23−29.) But even assuming Grabowski specifically noted where each Plaintiff was seated and tracked each Plaintiff throughout the duration of that Plaintiff's entire time outside, it is impossible to tell from watching these DVDs what, if anything, any particular inmate might have been saying or whether any of them was or was not feeling an unusual amount of pain or distress at any given time.

Defendants also point out that the DVD evidence shows at least 12 instances in which inmates were escorted off the basketball court, from which they argue that, when inmates voiced complaints about the heat, they were taken to the shade or indoors. (Doc. 46 at 10; Doc. 67 at 7, 9.) This argument is also unpersuasive. A trier of fact would not be able to tell from the silent and remotely-filmed DVD footage provided in this action what any of these inmates was saying, what level of distress any of them was feeling, why any of them were being escorted off the basketball court, where those who were escorted off the court were taken, or whether any other inmates complained of or showed signs of unusual distress at the same time and were ignored. Moreover, according to Plaintiffs' deposition testimony discussed above, many inmates complained to officers, including Defendant Fink, about the heat of the concrete and being burned and were ignored or told to shut up, and others were taken to the "pumpkin patch." Drawing all reasonable inferences in Plaintiffs' favor, as the Court must, genuine issues of material fact preclude the Court from finding that Defendant Fink was not deliberately indifferent to a known risk of serious harm to Plaintiffs.

The same cannot be said for Defendant Summers. As noted, to prevail on their Eighth Amendment claims, Plaintiffs must show that each, individual Defendant knew of and deliberately disregarded a substantial risk of serious harm to Plaintiffs. Plaintiffs' bare allegations in the Complaint that Defendant Summers was aware of the risk of harm

to Plaintiff's from the March 2014 search operation, but he did not change the protocol, are insufficient to create a triable issue of fact at the summary judgment stage. Plaintiffs also fail to point to any evidence on the record from which a reasonable jury could conclude that Summers was made personally aware of the risk of harm to Plaintiffs during the July 2014 Operation and showed deliberate indifference to that risk.

In summary, Defendants are entitled to summary judgment on Plaintiffs' claims against Defendants Grabowski, Whiting, and Summers, and the Court will grant summary judgment to these Defendants.

Genuine issues of material fact preclude the Court from making this same determination with respect to Defendant Fink. The Court will therefore address Defendants' alternative argument that Fink is, nonetheless, entitled to qualified immunity on Plaintiffs' Eighth Amendment claim.

**4. Qualified Immunity**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in

the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

Defendants argue that no officer could have reasonably believed that requiring fully clothed inmates to sit on a concrete basketball court for less than two hours on a hot day so that searches of the inmates' housing area could be conducted following a homicide violated a clearly established constitutional right. (Doc. 46 at 13.) With respect to Defendant Fink, however, the question is not whether requiring the inmates to remain outside under such circumstances, in general, violates a clearly established constitutional right. Rather, the question is whether an officer could have reasonably believed it was lawful to require the inmates to remain seated on a hot concrete surface even after a number of inmates audibly complained about their buttocks and/or legs being burned and one of them had to be moved due to visible injuries. Even without a case directly on point, the right not to be burned is sufficiently obvious that "it would be clear to a reasonable officer that his conduct [of ignoring inmate complaints] was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see Deorle v. Rutherford*, 272 F.3d 1272, 1275 (9th Cir. 2001) ("When the defendant['s] conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.") (internal quotation marks and citations omitted).

Additionally, even if the violation was not patently obvious under the circumstances, Plaintiffs cite to *Gordon v. Faber*, 973 F.2d 686, as showing it was clearly established at the time of this incident that subjecting inmates to extreme temperatures, even for short periods of time, violates the Eighth Amendment. (Doc. 54 at 8.) Defendants argue that *Gordon* does not clearly establish a constitutional violation for

purposes of this action because it is an Eighth Circuit case, it predates the deliberate indifference standard set forth in *Farmer*, and the facts in *Gordon* are not sufficiently analogous to those presented here to show a clear constitutional violation. (Doc. 67 at 12–13.) These arguments are unpersuasive. First, as previously discussed, the Ninth Circuit in *Johnson v. Lewis* specifically addressed the deliberate indifference standard from *Farmer*, and it cited to the facts in *Gordon* as a measure of when even short-term exposure to extreme temperatures is significantly serious to state an Eighth Amendment claim. 217 F.3d at 733. Additionally, although *Gordon* dealt with extreme cold, not extreme heat, the burns and blisters Plaintiffs testify to in this action are sufficiently analogous to the frostbite complaints in *Gordon* to establish that ignoring complaints of injury from extreme heat was unreasonable and violated clearly established law in this Circuit. Taking as true that Plaintiffs and other inmates complained aloud of being burned while they were seated on the hot concrete, Defendant Fink is not entitled to qualified immunity, and the Court will deny Defendants' Motion for Summary Judgment as to Defendant Fink.

## IV. Defendant Cardinale's Motion

### A. Facts

Defendant Cardinale incorporates Defendants Fink, Grabowski, Summers, and Whiting's Statement of Facts (*see* Doc. 49 at 2) and additionally sets forth the following facts:

On the day of the Operation, at approximately 12:44 p.m., Defendant Cardinale, who was overseeing the indoor searches, went out to the recreation field to help escort the inmates back inside Dorm 5. (Doc. 50 (Cardinale's Statement of Facts) ¶ 5.) At approximately 12:45 p.m., the inmates on C-Run were instructed to get up from where they were seated on the basketball court to return to the dorm, and they began walking towards the entrance to Dorm 5, which was a 40–45-yard walk from the basketball court. (*Id.* ¶¶ 6–7.)

According to Defendant Cardinale's facts, Cardinale noticed as the inmates were walking toward Dorm 5 that Plaintiff Barger, who was by then approaching the perimeter of the recreation field, was walking barefoot. (*Id.* ¶ 8.) Cardinale asked Barger why he was walking barefoot, and Barger told him his shower shoe had broken. (*Id.*) Cardinale immediately advised Barger to hurry up and run across the remaining approximately 20 yards of concrete and asphalt to avoid burning his feet, and Barger ran past one or two inmates in front of him and into Dorm 5. (*Id.*)

According to Plaintiffs' facts, Barger had a conversation with Cardinale right away at the time Cardinale told the inmates to go inside, and Barger told Cardinale that his shower shoes were unusable and he could not run barefoot to the dorm because the surface was too hot. (Doc. 57 (Plaintiffs' Separate Statement of Facts) ¶ 8.) Barger showed Cardinale his shower shoes and asked for a new pair, and Cardinale told him he could "get a new pair when [he got] inside." (*Id.*; Barger Dep. at 19:15–20:7 (Doc. 58 at 2).) A few minutes elapsed before the inmates received clearance to go inside, during which time Barger stood on his shower shoes on the concrete. (*Id.* at 20:8–20.) Before the inmates started moving, Cardinale told Barger to "just try to go around people." (*Id.* at 22:4–11 (Doc. 58 at 3).) Barger then had to run across hot gravel, concrete, and asphalt to get inside. (*Id.* at 21:9–13 (Doc. 58 at 2).)

It is undisputed that when Cardinale went inside Dorm 5, he advised his Commander about Barger running barefoot, and medical was called shortly thereafter to evaluate Barger's feet. (Doc. 50 ¶ 10; Doc. 57 ¶ 10.) An Information Report signed by Sgt. Whiting summarizes this incident. (Cardinale Decl. ¶ 11 (Doc. 47-1 at 34); Doc. 47-1 at 37-39).)

It is also undisputed that, other than this instance, Cardinale was never advised by any staff or inmates of any complaints by inmates of issues they had with the heat or of any injuries they sustained, and he was not advised of anything he needed to address or rectify to prevent serious harm to the inmates. (Doc. 50 ¶ 11; Cardinale Decl. ¶ 13 (Doc. 47-1 at 34–35).)

**B. Discussion**

Because the Court has already found that the record contains sufficient evidence to support the objective prong of Plaintiffs' Eighth Amendment claims, the Court will turn to whether the evidence shows that Defendant Cardinale was deliberately indifferent to a substantial risk of serious harm to Plaintiffs.

Taking Plaintiffs' version of the disputed facts as true, Cardinale became aware of a problem with Barger's shower shoes at the time the inmates from C-Run were first ordered to stand up to go inside. At that point, Cardinale told Barger he could get new shower shoes when he got inside, but he did not address Barger's complaint that it was too hot to walk without his shoes until the inmates were ordered to start walking toward the dorm. At that point, Cardinale told Barger to "just try to go around people." (*Id.* at 22:4−11 (Doc. 58 at 3).)

Defendant argues, and the Court agrees, that these facts do not show that Cardinale inferred that Barger faced a substantial risk of serious harm and he deliberately disregarded that risk. (*See* Doc. 65 at 8.) First, it is undisputed that Cardinale was directing the indoor searches while Plaintiffs were outside on the recreation field, and he only went out to the basketball court when it was time to direct the inmates back inside. There is no evidence Cardinale personally observed or had otherwise been made aware that any inmates had been burned due to the surface temperature of the concrete such that he could have and did infer that the temperature of the basketball court and surrounding areas was hot enough to pose a substantial risk of serious harm to Barger. But even assuming Cardinale reasonably inferred some risk of harm to Barger from having to walk barefoot across 40−45 yards of hot surfaces, the evidence does not support that Cardinale acted with deliberate indifference in response. Assuming, as Barger testifies, that Cardinale told Barger before he started to walk, to "just try to go around people" Cardinale took some action to address Barger's concern. (*Id.* at 22:4−11 (Doc. 58 at 3).) Further, the DVD evidence shows that Cardinale approached Barger a second time as Barger neared the last 20 yards and motioned him toward the dormitory, at which point

Barger broke ranks and ran past other inmates, as he testifies he had previously been directed to do. (DVD 2 at 2:45:50–2:45:57.) It is also undisputed that, once inside, Cardinale alerted his Commander that Barger had walked across the yard barefoot and Barger was then called to medical for an evaluation. These facts show, at most, that Cardinale was negligent in failing to assess the seriousness of the risk of harm to Barger's feet from walking barefoot at the time, but they do not show or raise a triable issue of fact that Cardinale acted with deliberate indifference or with a "sufficiently culpable state of mind," to support a constitutional claim. *Farmer*, 511 U.S. at 834.

The evidence also does not support that Cardinale was deliberately indifferent to any of the remaining Plaintiffs. Plaintiffs do not dispute that Cardinale's interaction with Barger is the only instance during the overall Operation in which Cardinale was alerted to any risk of harm to an inmate. Absent any evidence showing Cardinale was aware of any other issues or injuries to inmates and had the authority to address those concerns but failed to do so, there is no basis for finding on the current record that he was deliberately indifferent to any of the remaining Plaintiffs. The Court will grant Defendant Cardinale's Motion for Summary Judgment.

**IT IS ORDERED**:

(1) Defendants Fink, Grabowski, Summers, and Whiting's Motion for Summary Judgment (Doc. 46) is **granted in part** as to Defendants Grabowski, Summers and Whiting, and **denied in part** as to Defendant Fink.

(2) Defendant Cardinale's Motion for Summary Judgment (Doc. 49) is **granted**.

(3) Defendants Grabowski, Summers, Whiting, and Fink are **dismissed** from this action with prejudice.

. . . .

. . . .

. . . .

. . . .

(4) The remaining claim in this action is Plaintiffs' Eighth Amendment claim against Defendant Fink.

Dated this 23rd day of August, 2017.

Paul G. Rosenblatt
United States District Judge